**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSHUA JAMES FROST,<br>*Petitioner-Appellant*,<br><br>v.<br><br>MARGARET GILBERT,<br>Superintendent,[*]<br>*Respondent-Appellee.* | No. 11-35114<br><br>D.C. No.<br>2:09-cv-00725-TSZ<br><br>ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, Senior District Judge, Presiding

Argued and Submitted En Banc June 26, 2013
Seattle, Washington

Filed March 21, 2016
Amended August 29, 2016

Before: Sidney R. Thomas, Chief Judge, and Stephen Reinhardt, Alex Kozinski, Kim McLane Wardlaw, Richard A. Paez, Richard C. Tallman, Johnnie B. Rawlinson, Jay S. Bybee, Consuelo M. Callahan, Milan D. Smith, Jr. and Jacqueline H. Nguyen, Circuit Judges.

---

[*] We substitute Superintendent Margaret Gilbert for Patrick Glebe as the respondent-appellee on our own motion. *See* Fed. R. App. P. 43(c)(2).

Order;
Opinion by Judge Kozinski

## SUMMARY[**]

### Habeas Corpus

In light of the Washington State Bar Association Office of Disciplinary Counsel's dismissal of a grievance against Zachary C. Wagnild, the en banc court filed an order withdrawing an opinion and dissent filed March 21, 2016, replacing the opinion and dissent with a unanimous amended opinion, and ordering a petition for rehearing en banc filed by the King County Prosecutor's Office and Wagnild's joinder in the petition for rehearing filed as amicus briefs.

In the amended opinion, the en banc court, on remand from the Supreme Court, affirmed the district court's denial of habeas corpus relief to Washington state prisoner Joshua Frost, who challenged his conviction on charges stemming from his participation in a spree of armed robberies and a burglary.

The en banc court held that the King County Superior Court's erroneous refusal to allow defense counsel to make alternative arguments during summation – that the state hadn't met its burden of proof, and that Frost committed the crimes under duress – was harmless because the jury heard overwhelming evidence that Frost committed the charged

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

offenses and any argument that the prosecution failed to meet its burden of proof would have fallen on deaf ears.

The en banc court granted a certificate of appealability as to Frost's claims that the prosecution withheld material, exculpatory evidence in violation of *Brady v. Maryland* and that the prosecution called witness Edward Shaw to testify falsely about the existence of that evidence in violation of *Napue v. Illinois*.

The en banc court held that while Frost may have shown cause for failing to raise the *Brady* and *Napue* claims in his 2008 personal restraint petition, he cannot show prejudice. The en banc court explained that given the evidence of guilt presented at trial, there is no reasonable likelihood that Shaw's false testimony about having only one plea agreement could have affected the judgment of the jury, and there is no reasonable likelihood that the jury could have acquitted Frost based on his duress defense, even if they had learned of an undisclosed signed version of Shaw's plea agreement in a firearm-and-drug possession case or an undisclosed plea agreement in Shaw's domestic-violence case.

## COUNSEL

Erik B. Levin (argued), Law Office of Erik Levin, Berkeley, California, for Petitioner-Appellant.

John Joseph Samson (argued), Assistant Attorney General, Corrections Division; Robert W. Ferguson, Attorney General, Olympia, Washington, for Respondent-Appellee.

David M. Porter, Co-Chair, NACDL Amicus Committee, Sacramento, California; Jon M. Sands, Federal Public Defender and Keith J. Hilzendeger, Assistant Federal Public Defender, Phoenix, Arizona, for Amici Curiae Ninth Circuit Federal Public and Community Defenders and National Association of Criminal Defense Lawyers.

James M. Whisman, Senior Deputy Prosecuting Attorney; Daniel T. Satterberg, King County Prosecuting Attorney; Seattle, Washington; as and for Amicus Curiae King County Prosecuting Attorney.

Steven W. Fogg, Corr Cronin Michelson Baumgardner Fogg & Moore LLP, Seattle, Washington, for Amicus Curiae Zachary C. Wagnild.

## ORDER

In light of the Washington State Bar Association Office of Disciplinary Counsel's dismissal of the grievance against Zachary C. Wagnild, ODC File No. 16-00470, the previous majority opinion and dissent filed March 21, 2016, and reported at 818 F.3d 469, are **WITHDRAWN** and **REPLACED** by the attached unanimous amended opinion. The petition for rehearing en banc filed by the King County Prosecutor's Office and Zachary C. Wagnild's joinder in the petition for rehearing are ordered to be **FILED** as amicus briefs.

Future petitions for rehearing en banc will not be entertained from the filing of the amended opinion.

## OPINION

KOZINSKI, Circuit Judge:

In 2003, Joshua Frost was charged in state court with participating in an eleven-day spree of armed robberies and a burglary. Frost's attorney wanted to argue during summation that the state hadn't met its burden of proof and, in the alternative, that Frost committed the crimes under duress. The King County Superior Court erroneously refused to allow counsel to make these alternative arguments, so he chose to argue duress. The Washington Supreme Court held that the superior court's error was harmless. *State* v. *Frost*, 161 P.3d 361, 370–71 (Wash. 2007) (en banc). In a previous en banc opinion, we held that the restriction on Frost's closing argument was structural error. *Frost* v. *Van Boening*, 757 F.3d 910, 918–19 (9th Cir. 2014) (en banc). The Supreme Court reversed. *Glebe* v. *Frost*, 135 S. Ct. 429, 432 (2014) (per curiam). We must now decide whether Frost is nevertheless entitled to habeas relief because the error, though not structural, was prejudicial. In addition, we consider *Brady* and *Napue* issues that the district court did not certify for appeal.

## DISCUSSION

**I. The Harmless Error Issue**

Our review of the Washington Supreme Court's harmless-error decision is governed by the Antiterrorism and Effective Death Penalty Act. *See* 28 U.S.C. § 2254(d)(1) (requiring petitioners to demonstrate that a state court's decision on the merits is "contrary to, or involved an unreasonable application of, clearly established [f]ederal law" to obtain

6                     FROST V. GILBERT

habeas relief). We may reverse the state supreme court's harmlessness determination only if Frost experienced "actual prejudice," that is, where we have "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *See Davis* v. *Ayala*, 135 S. Ct. 2187, 2197–98 (2015) (quoting *O'Neal* v. *McAninch*, 513 U.S. 432, 436 (1995) and *Brecht* v. *Abrahamson*, 507 U.S. 619, 637 (1993)); *see also id.* at 2198–99 (explaining that the *Brecht* standard "subsumes" the requirements of AEDPA, which "sets forth a precondition to the grant of habeas relief" (quoting *Fry* v. *Pliler*, 551 U.S. 112, 119–20 (2007))). Specifically, the inquiry is whether, in light of the record as a whole, the improper limitation on defense counsel's closing argument substantially influenced the verdict. *Brecht*, 507 U.S. at 638–39.

The jury heard overwhelming evidence that Frost committed the charged offenses. The prosecution introduced Frost's recorded confessions, and he testified that he participated in the robberies and the burglary. The prosecution also linked evidence found in Frost's home to the crimes. On this record, any argument that the prosecution failed to meet its burden of proof would have fallen on deaf ears. Accordingly, Frost wasn't prejudiced by the superior court's error in denying him the right to make that argument. *See Brecht*, 507 U.S. at 637–38; *see also Davis*, 135 S. Ct. at 2199.

## II. The *Brady* and *Napue* Issues

Frost maintains that the prosecution withheld material, exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). He claims that the evidence would

FROST V. GILBERT 7

have undermined the testimony of Edward Shaw, a key prosecution witness. He also argues that the prosecution called Shaw to testify falsely about the existence of that exculpatory evidence in violation of *Napue* v. *Illinois*, 360 U.S. 264, 269–70 (1959).

Shaw wasn't involved in the robberies and burglary at the heart of the prosecution's case. Rather, he was an acquaintance who testified about how Frost interacted with ringleader Matthew Williams, who Frost claimed coerced him into participating in the crimes. In April 2003, Shaw met with detectives to discuss what he knew about Frost's involvement. At that time, Shaw had pending charges for unlawful possession of drugs and a firearm. Shaw asked for favorable treatment in exchange for information about Frost's criminal activity but the prosecution refused to make a deal. Nevertheless, Shaw disclosed what he knew. Frost was arrested the same day. *State* v. *Frost*, 161 P.3d at 364.

Subsequently, but before Frost's trial, Shaw was charged with second-degree assault with a deadly weapon growing out of a domestic-violence incident. Shaw negotiated two plea agreements, which are dated November 2003, a few weeks before Frost's trial. He received a nine-month sentence for all his crimes, conditioned on his testifying truthfully against Frost.

At trial, Shaw testified that Frost was "giggling" when Shaw asked whether he was involved in the robberies and burglary. The prosecution highlighted this testimony in its closing: "When Mr. Shaw talked to the defendant about his involvement in these robberies, the defendant was giggling. Does that sound like duress?"

Shaw also testified about the plea agreement for his unlawful-possession case. The prosecution introduced an unsigned letter summarizing that agreement. Shaw testified that he had signed a version of the agreement that was identical to the letter the state presented at trial. Shaw didn't mention that he was also negotiating a separate agreement to resolve his domestic-violence charges. The prosecution did not disclose the existence of Shaw's domestic-violence plea agreement, which ultimately provided that the sentence for that offense would run concurrently with that for unlawful possession; nor did it otherwise correct his testimony.

Nor was the signed version of Shaw's unlawful-possession plea agreement identical to the letter presented at trial; it contained a handwritten reference to his domestic-violence case number. The prosecution didn't produce the annotated version of the unlawful-possession plea agreement or the domestic-violence plea agreement. Rather, the prosecution waited until two days after Frost was convicted to file both plea agreements in Shaw's state-court cases. The state doesn't dispute that the prosecution was required by *Brady* to turn over both plea agreements before Frost's trial.

In March 2008, shortly after exhausting his direct appeal, Frost sent a letter requesting "any documentation that could be used to establish the credibility and or expierance [sic] Mr. Shaw has or had as a Police Informant." The public records officer responded by identifying several docket numbers involving Shaw, including his domestic-violence case. The records officer estimated that there were "1000 pages of documents" responsive to Frost's request, which would cost $195.00 to copy and ship. In his reply, Frost explained that he wasn't "looking for complete case files, as that would be quite expensive." Rather, he sought "any documents" that

could show "any special treatment [Shaw] was given in regards to . . . cooperation with [the prosecuting attorney's] office or the King County Police Department." The records officer responded that she did not "find any records responsive to [Frost's] request."

Frost persisted: He wrote back that he knew Shaw had given statements in a particular case, which he identified by number. He asked the records officer to "please try and comb through the above-mentioned case files" for Shaw's statements and "please send [Frost] a list of any and all King County Police Case Numbers brought up in those files." The records officer responded by identifying two docket numbers—neither of which was the domestic-violence case—and informing Frost that she found a statement that Shaw made in the unlawful-possession case file. No documents were provided pertaining to the domestic-violence case. Frost filed a personal restraint petition shortly afterward in which he raised a number of claims for relief, but didn't allege any *Brady* or *Napue* violations.

The undisclosed plea agreements first came to light in 2009 when the Federal Public Defender for the Western District of Washington, appointed by the district court to represent Frost in his federal habeas proceeding, searched Shaw's records at the King County Superior Court Clerk's Office. Counsel quickly filed another personal restraint petition based on this evidence, but the Washington Supreme Court denied it as untimely. The federal magistrate judge found that the supreme court relied on a valid procedural rule in dismissing Frost's *Brady* and *Napue* claims and that Frost hadn't shown cause to overcome this default.

In objecting to the magistrate judge's report and recommendation, Frost argued that the prosecution's continued failure to disclose the domestic-violence plea agreement frustrated his ability to raise timely *Brady* and *Napue* claims. He presented his 2008 communications with the King County Prosecuting Attorney's Office. Accordingly, he asserted that he had cause for his procedural default.

The district judge adopted the magistrate judge's report and recommendation in full. He concluded that Frost's evidence didn't demonstrate that the prosecuting attorney's office engaged in "persistent efforts to suppress" impeachment evidence. The district judge also found that Shaw's testimony wasn't pivotal in light of the prosecution's ample evidence establishing Frost's involvement in the charged crimes. The district judge declined to grant certificates of appealability on Frost's *Brady* and *Napue* claims.

A.

The standard for granting a certificate of appealability is low. *Shoemaker* v. *Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (as amended). All that's required is that "reasonable jurists could debate" whether the petition states a "valid claim of the denial of a constitutional right" and whether the district court "was correct in its procedural ruling." *Slack* v. *McDaniel*, 529 U.S. 473, 484 (2000). As explained below, these issues are at least debatable and implicate Frost's constitutional rights. Accordingly, Frost has met the standard for granting a certificate of appealability, and we do so here.

B.

Because the Washington Supreme Court held that Frost defaulted on his *Brady* and *Napue* claims, he must overcome the default by showing cause and prejudice. *See Strickler* v. *Greene*, 527 U.S. 263, 282 (1999).

*Cause*. Frost started researching his *Brady* and *Napue* claims well before the deadline for filing a personal restraint petition had passed. The Supreme Court denied Frost's petition for certiorari on January 14, 2008, *see Frost* v. *Washington*, 552 U.S. 1145 (Jan. 14, 2008), so he had until January 14, 2009 to seek relief through collateral review. *See* Wash. Rev. Code § 10.73.090(2), (3)(c) (2008). Frost made his first inquiry to the King County Prosecuting Attorney's Office about documents that would call Shaw's credibility into question in March 2008. Had the prosecuting attorney's office responded accurately to Frost's document requests, he could have filed a timely petition.

Frost first asked for "any documents . . . that could be used to establish the credibility . . . Mr. Shaw has or had as a Police Informant." The records officer represented that she could provide complete case files for $195 or that Frost could narrow his search. Frost narrowed the search by asking for "any documents . . . in regards to any special treatment [Shaw] was given in regards to . . . cooperation with your office or the King County Police Department." The officer responded that she did "not find any records responsive to [Frost's] request." Frost then rephrased his query as for "information . . . that would show [Shaw's] reliability," but maintains that the records officer was unresponsive to his request.

Frost explains that his delay in bringing his *Brady* and *Napue* claims is due to the King County Prosecuting Attorney Office's initial failure to disclose potentially exculpatory information surrounding Shaw's plea agreements. And its later failure to disgorge Shaw's plea agreements, despite Frost's repeated requests, may amount to "interference by officials" that supplies cause to excuse Frost's procedural default. *Murray* v. *Carrier*, 477 U.S. 478, 488 (1986) (quoting *Brown* v. *Allen*, 344 U.S. 443, 486 (1953)). At the least, it shows "some objective factor external to the defense" that prevented Frost from complying with Washington's rule setting time limits for bringing personal restraint petitions. *Id.*; *accord Amadeo* v. *Zant*, 486 U.S. 214, 222 (1988).

Frost filed a personal restraint petition in 2008 raising multiple claims for relief. No doubt, he would have presented allegations of *Brady* and *Napue* violations in that petition, had he been aware of the facts supporting those arguments. "[T]he reason for [Frost's] failure to develop facts in [s]tate-court proceedings may have been the [s]tate's suppression of the relevant evidence." *Banks* v. *Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 282). If so, Frost has demonstrated cause for failing to raise his *Brady* and *Napue* claims in his 2008 personal restraint petition. *See, e.g.*, *Amadeo*, 486 U.S. at 222 (finding "ample cause to excuse [a petitioner's] procedural default" where county officials concealed a key document and counsel had no tactical reason for failing to raise the claim); *Crawford* v. *Head*, 311 F.3d 1288, 1327 (11th Cir. 2002) (petitioner demonstrated cause where state failed to disclose *Brady* material in its possession despite multiple requests from counsel); *Crivens* v. *Roth*, 172 F.3d 991, 995 (7th Cir. 1999) (petitioner had cause to overcome procedural default of *Brady* claim where

FROST V. GILBERT 13

prosecution didn't provide the criminal record of its witness until after the habeas petition was filed).

*Prejudice.* While Frost may have shown cause, he cannot show prejudice. Given the evidence of guilt presented at trial, there is no "reasonable likelihood" that Shaw's false testimony about only having one plea agreement could have "affected the judgment of the jury." *Sivak* v. *Hardison*, 658 F.3d 898, 912, 914 (9th Cir. 2011) (quoting *Jackson* v. *Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008)) (finding no prejudice at trial from a *Napue* violation where the defendant's own testimony and physical evidence "pointed to his guilt"). Had the jury learned of Shaw's second plea agreement, there is no "reasonable probability" that the outcome would have been different. *See Strickler*, 527 U.S. at 296.

Shaw's undisclosed domestic-violence offense carried a maximum sentence of five years—the same as his unlawful-possession offenses. It is unlikely that the prosecution could have put pressure on Shaw to change his testimony by threatening to seek consecutive sentences for his offenses. In Washington, there is a presumption that sentences imposed at the same time will be served concurrently. Wash. Rev. Code § 9.94A.589(1)(a); *State* v. *Vance*, 230 P.3d 1055, 1058–59 (Wash. 2010) (en banc). Nothing in the record suggests that the state could have overcome this presumption. Neither of Shaw's crimes were "serious violent offenses." Wash. Rev. Code § 9.94A.030(37) (2002) (defining "serious violent offense"); *id.* § 9.94A.589(1)(b) (requiring consecutive sentences for defendants who've committed two or more serious violent offenses). Nor is there evidence of any other factor that Washington courts normally rely on in justifying consecutive sentences, such as the use of a "high degree of

14       Frost v. Gilbert

sophistication or planning," or an abuse of a "position of trust." *See id.* § 9.94A.535(2)(e)(v)–(vi).

While Frost could have shown that Shaw was a bad guy because he not only unlawfully possessed a firearm and drugs but also assaulted his girlfriend, it wouldn't have gotten him far. The jury already knew that Shaw received benefits in exchange for his testimony. The jury also heard that Shaw gave information about Frost's crimes to the police even after they declined a deal on his pending unlawful-possession charges. And the jury was aware that Shaw approached authorities with information about Frost in April, well before he committed the assault in August.

Any impact of this impeachment evidence would have been vitiated by Frost's own testimony, which cast doubt on his duress defense. Frost didn't have a good answer for why he didn't attempt to escape from Williams when he had a chance. He admitted that he was left alone in the car when his accomplices committed one of the robberies. Frost also admitted that he picked up Williams on several occasions, as Williams didn't have a car. Frost acknowledged that he never tried to get his mother and brother to a safe place in response to Williams's alleged threats against them. Nor did he call 911, although he'd previously done so when he felt threatened by others. Finally, Frost admitted that, during his first interview with the police, he didn't say that he had been threatened by Williams, even though the officer twice urged him to say "anything" he wanted. There's no reasonable likelihood that the jury could have acquitted Frost based on his duress defense, even if they had learned of the undisclosed plea agreements.

\* \* \*

Because Frost can't show prejudice as a result of the errors committed at his trial, he is entitled to no relief in federal court.

**AFFIRMED.**